Filed 6/18/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDRES MARTINEZ,<br><br>on Habeas Corpus. | A134400<br><br>(Del Norte County<br>Super. Ct. No. HCPB11-5224)<br><br>ORDER MODIFYING OPINION<br>[NO CHANGE IN JUDGMENT] |

**BY THE COURT:**

The opinion filed herein on May 31, 2013, is modified as follows.

On page 22, in the second sentence of the first full paragraph which reads, "As noted, as one of the exhibits to his traverse, petitioner submitted the declaration of Peter Orner, a creative writing instructor at San Francisco State University who has also taught at other institutions, written books, and received various literary awards for his work," the word "instructor" should be changed to "professor."

This modification does not effect a change in the judgment.


Dated: _____ P.J.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re ANDRES MARTINEZ,<br><br>   on Habeas Corpus. | A134400<br><br>(Del Norte County<br>Super. Ct. No. HCPB11-5224) |

   Petitioner Andres Martinez, a prison inmate, ordered by mail a copy of The Silver Crown, a book by Mathilde Madden. The book was confiscated by prison authorities before it was delivered to petitioner on grounds that it was contraband, specifically "erotica." Through a series of administrative appeals the prison has clarified that it deems the book "obscene" and tending to incite violence, and therefore subject to rules governing contraband in prison.

   We conclude first that the prison failed to abide by governing statutes and regulations in judging the book to be obscene. And we go on to find that the book is not obscene applying the correct definition, and further that it is not likely to incite violence. We therefore grant the writ and order the Warden to give the book to petitioner.

**FACTUAL AND PROCEDURAL BACKGROUND**

**Petitioner's criminal history**

   In 1990 to 1992, petitioner was convicted of multiple crimes, including firearm assault, attempted second degree robbery, and attempted murder. (Pen. Code, §§ 187, 211, 245, subd. (a)(2), 664.) He is currently an inmate in the custody of the California Department of Corrections and Rehabilitation (CDCR) and is housed at Pelican Bay State Prison (Pelican Bay) in the Security Housing Unit (SHU), where the most dangerous prisoners are housed. He has been assigned to the SHU in part for violence in prison,

including battery on an inmate, possession of a deadly weapon, and battery on a peace officer. He is also considered a "validated associate" of the Mexican Mafia prison gang.

**Confiscation of the book**

More than two years ago, petitioner ordered a copy of The Silver Crown, a paperback book written by Mathilde Madden and published by Black Lace books.[1]  On January 10, 2011, before the book was delivered to petitioner, prison authorities notified him the book was being withheld, citing California Code of Regulations, title 15, section 3006, subdivision (c)(1),[2] and labeling the book "erotica."  On January 12, 2011, a second notice (CDCR form 1819) recited that the book was being withheld because "it contains descriptions of explicit sexual conduct," this time citing subdivision "(c)(15)(A)(B)(C)(1)."[3]

**The book**

The Silver Crown is the second book in a trilogy  and is described on the back cover this way:  "Every full moon, Iris kills werewolves. It's what she's good at; it's what she's trained for.  She's never imagined doing anything else . . . until she falls in love with one.  And being a professional werewolf hunter and dating a werewolf poses a serious conflict of interest.  To add to her problems, a group of witches decides she is the chosen one—destined to save humanity from the wolves at the door—while her boss, Blake, who just happens to be her ex-husband, is hell-bent on sabotaging her new relationship.  All Iris wants is to snuggle up with her alpha wolf and be left alone.  He might turn into a monster once a month, but in a lot of ways, Iris does, too."

We have reviewed the book. As will be described more fully below, the plot involves werewolves, witches, a ghost, and magic spells.  It is 262 pages long with

---

[1] According to the publisher's Web site (www.blacklace.co.uk), it specializes in erotic books written by women for women.

[2] Section references without further specification are to title 15, California Code of Regulations.

[3] References to subdivisions without further specification are to the subdivisions of California Code of Regulations, title 15, section 3006.

44 chapters. There is a fair amount of violence in it, but that is not dwelt upon and is not shocking or gory.

There are also a great number of graphic sexual encounters, one per chapter through most of the book, including detailed descriptions of intercourse, sodomy, oral-genital contact, oral-anal contact, voyeurism, exhibitionism, and *ménage à trois*. Semen is mentioned. Crude slang is used to describe various body parts and the sex act itself. The sex is sometimes rough but always consensual. Women are portrayed as frequently aggressive, always willing, and seemingly insatiable. Men are portrayed as frequently demanding, always ready, and seemingly inexhaustible. The sex occurs between humans and werewolves, as well as intra-species.

On the other hand, the sex appears to be between consenting adults. No minors are involved. No bestiality is portrayed (unless werewolves count). And there is no sadomasochism.

**Administrative appeals**

Petitioner filed an administrative appeal on January 11, 2011. (§ 3084.1.) He argued section 3006 "does not ban descriptions of sexually explicit conduct, as long as those descriptions are not obscene . . . ." Petitioner claimed the decision to withhold the book was "arbitrary and irrational" and violated his rights under Penal Code section 2601 and the First Amendment. He also argued the book would not incite violence as prohibited under subdivision (c)(1).[4]

Prison authorities responded that the book "contain[s] very detailed descriptions of penetration of the vagina, mouth and genitals, as well as excretory functions" and that it "advocates violence because it describes ripping at a decapitated mans [*sic*] head and other violent killings." The reviewer also noted that "the back cover of the book list [*sic*] the book as *Erotic Romance*." The denial underscored the language of

---

[4] This was evidently included in the appeal because the first notice had cited subdivision (c)(1) in withholding the book. That initial citation appears to have been in error, as subdivision (c)(1) governs violent content, not erotica.

4

subdivision (c)(15)(C)(1) in explaining why the book had been confiscated and also cited Pelican Bay Operational Procedure No. 806, Personal Property Plan, Section VI-F-7.[5]

Petitioner filed a second level appeal on February 21, 2011, claiming the "first level reviewer <u>failed</u> to properly apply all (3) three prongs of the obscene material test articulated in" subdivision (c)(15)(A), including whether the book "taken as a whole appeals to prurient interest[6] and whether the book taken as a whole lacks serious literary, artistic, political or scientific value."  He also argued again that the book would not incite violence.

On March 9, 2011 the second level appeal was denied by the Warden, again citing and underlining subdivision (c)(15)(C)(1).  The warden also cited Pelican Bay's Operational Procedure No. 806, quoting that provision, in part, as stating, "*Inmates will not be allowed to possess publications, pictorials, or drawings consistent with CCR Title 15, Section 3006(c)(15).  Except as authorized by institutional head, inmates shall not possess or have under their control matter which contains any of the following: Obscene material.  Obscene material includes but is not limited to material that <u>depicts, displays or describes penetration of the vagina.</u>*"   The denial also stated "sexually explicit erotica is present in this publication, and [it] is therefore contraband."

Petitioner then filed a Director's Level Review, which resulted in a letter from CDCR dated July 29, 2011, again denying petitioner's appeal.  The Director's Level Review concluded "appellant has not supported his appeal issue with sufficient evidence or facts to warrant a modification" of the second level review.  "This decision exhausts the administrative remedy available to the appellant within CDCR."

---

[5] Both the first and second level appeal denials refer to this section of the Operational Procedure, but we find the correct reference is to section VI-F-6. (Pelican Bay Operational Procedure No. 806 (Jan. 2010) pp. 11-14.)  This procedural rule appears to be applicable only to Pelican Bay, as opposed to CDCR as a whole.  We take judicial notice of this document under Evidence Code sections 452, subdivision (b), and 459.

[6] "Prurient interest" is "a shameful or morbid interest in nudity, sex, or excretion." (Former Pen. Code, § 311 (Stats. 1969, ch. 249, § 1, p. 598); *Miller v. California* (1973) 413 U.S. 15, 16, fn. 1 (*Miller*); *Bloom v. Municipal Court* (1976) 16 Cal.3d 71, 77.)

**Habeas petition in superior court**

On September 22, 2011, petitioner filed a petition for writ of habeas corpus in Del Norte County Superior Court (Docket No. HCPB11-5224) raising the same issues raised in the administrative appeals.

On November 3, 2011, Superior Court Judge William H. Follett issued a four-page opinion denying the petition.   The court concluded "prison officials acted within their authority to ban the book due to its sexually explicit descriptions," and therefore did not address whether the book might "also have been disallowed due to its depiction of violence.  [¶] . . . [¶] While it could be argued that section 3006 requires application of broader 'statewide' standards, and not special standards for prisons, recent case law does not appear to agree."  The court also concluded that petitioner's argument that his rights under Penal Code section 2601, subdivision (c)(1), had been violated had "previously been considered by the appellate courts and has been rejected."

The gist of the court's decision is reflected in the following excerpt:

"A cursory review of the book in question, *The Silver Crown*, reveals that explicit language is used to describe various sex acts from which prison authorities could determine the book falls within the definition of 'obscene' under prison regulations.  The excerpt from the book on the front endpaper describes in explicit terms a woman having sex with a werewolf. . . .  Thumbing through the book reveals many descriptions of several sex acts listed in subdivision (c)(15) of section 3006.

"Case law has determined that the ban on sexually explicit materials under section 3006 of Title 15 of the California Code of Regulations does not violate the state and federal constitutions nor Penal Code section 2601.  See, *Snow v. Woodford* (2005) 128 Cal.App.4th 383 (*Snow*).  The *Snow* court made a four-prong *Turner v. Safley* (1987) 482 U.S. 78 analysis, which will not be repeated here, to determine that prison authorities had a legitimate penological interest in prohibiting inmates from possessing sexually explicit materials.  The court quoted the department's written reasons for the provision published during the rule-making process.

6

" 'Rules governing possession of contraband in prison are complex and not easily evaluated outside prison walls.' *In re Johnson* (2009) 176 Cal.App.4th 290, 301. 'Prison officials have a strong interest in excluding material that appeals to the prurient interest of inmates.' *Id*. at 302. In *Johnson*, prison officials had disciplined an inmate for possessing a copy of an article from *Men's Health* magazine, which the Court of Appeal sustained. That Court noted that such a magazine is not one that would normally be characterized as an obscene publication in that it contained useful and socially acceptable articles suited for adults in America. Nevertheless, the Court agreed that such material may not be suitable for prison inmates. In reviewing a challenge to the administrative decision of prison officials, a court must determine whether there is 'some evidence' to support the prison officials' determination that the material falls 'within the expanded definition of obscenity found in section 3006 subdivision (c)(15)(A) . . .' *Id*. at 301. As noted by the *Johnson* court, subdivision (c)(15)(C) reaches 'beyond to sexually explicit material that would generally not be considered obscene outside prison walls.' *Id*. at 302. A review of the book in question demonstrates that it fits within the regulatory expanded definition of obscenity as determined by the appellate court."

**Proceedings in this court**

On January 30, 2012, petitioner filed his habeas petition in this court. He contends authorities at Pelican Bay arbitrarily applied the governing regulation so that, as applied, he has been deprived of his First Amendment rights and his rights under Penal Code section 2601. The essence of petitioner's claim is that the prison authorities who confiscated his book and ruled on his administrative appeals misapplied section 3006 because they failed to apply all three prongs of the test contained within subdivision (c)(15)(A). Specifically, he claims that none of the reviewing authorities considered the third prong of the test, namely whether the book "taken as a whole, lacks serious literary, artistic, political, or scientific value."

Petitioner also claims the violence in the book is not such as to incite murder, arson, riot, or other violence within the prison. (§ 3006, subd. (c)(1).) In particular, petitioner contends that The Silver Crown is no more violent than several other books

7

available in the SHU general library at Pelican Bay, as well as other recognized great works of literature, such as Homer's Iliad and Dostoyevsky's Crime and Punishment.

We issued an order to show cause and appointed counsel for petitioner.

The warden's return was filed on April 16, 2012. It argues that the book was properly confiscated, that some literary content socially acceptable outside of prison may not be suitable for prison inmates, that prison officials are best left in charge of what is deemed contraband, and that deference is owed to those officials when they make a determination that a literary restriction is necessary to advance a legitimate penological interest.

Attached to the return as Exhibit 2 is a declaration of Lt. Ricky Graves, who signed petitioner's CDCR Form 1819. Graves had been a correctional officer for approximately 28 years and declared he had personally noticed a decline in inmate "sexual harassment and predatory-type behavior" since the prison started restricting inmate access to pornography.

On May 22, 2012, petitioner's counsel filed a motion to compel discovery from the prison. We granted the motion, ordering five categories of discovery to be provided, including records documenting the date on which inmates' access to obscene and violent materials was first restricted, records of incidents both before and after that date that resulted from access to obscene or violent materials, and a list of all fiction titles available in the Pelican Bay library as well as those confiscated as contraband based on obscene or violent content.

In response to the discovery order, the warden represented that restrictions on obscene and violent materials have been in force since January 3, 1995. He also provided background materials relating to the promulgation of the relevant subdivisions of section 3006 ; a list of fiction titles available in the Pelican Bay library; approximately 175 CDCR forms 1819 showing materials that had been withheld from prisoners as obscene or inciting violence; and a list of publications disallowed throughout CDCR. No documentary support was provided for Graves' testimony that incidents of harassment

and predatory behavior by inmates had decreased following restriction of obscene and violent materials.[7]

Petitioner filed his traverse on September 21, 2012. As exhibits to the traverse, petitioner provided us with copies of the discovery material produced by respondent, as well as with complete copies of three books he claims are comparable to The Silver Crown available in the Pelican Bay SHU general library: Kissing Sin, by Keri Arthur; Full Moon Rising, also by Keri Arthur; and Inner City Hoodlum, by Donald Goines. Another exhibit to the traverse was a declaration by Peter Orner, a college-level professor of creative writing, opining that The Silver Crown is not obscene and possesses "literary merit."

## DISCUSSION

### Introduction

Central to our inquiry is the interpretation of two specific provisions of section 3006, subdivision (c), which define two types of prison contraband, subdivisions (c)(1) and (c)(15). Subdivision (c)(1) prohibits material that tends to incite violence: "Inmates may possess only the personal property, materials, supplies, items, commodities and substances, up to the maximum amount, received or obtained from authorized sources, as permitted in these regulations. Possession of contraband as defined in section 3000 may result in disciplinary action and confiscation of the contraband. [¶] . . . [¶] . . . (c) Except as authorized by the institution head, inmates shall not possess or have under their control any matter which contains or concerns any of the following: (1) Any matter of a character tending to incite murder; arson; riot; or any form of violence or physical harm to any person, or any ethnic, gender, racial, religious, or other group."

---

[7] The Attorney General explained that Graves's declaration was "not based on specific records of any such incidents," but rather was "based on his experience working in the . . . SHU over the last twenty years." She also argued "it is unlikely that the prison would have documented that an incident resulted from access to obscene or violent materials in describing the offending misconduct."

9

Subdivision (c)(15) further defines as contraband, "Obscene material and mail containing information concerning where, how, or from whom obscene material may be obtained. [¶] (A) Obscene material means material taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest; and is material which taken as a whole, depicts or describes sexual conduct; and which, taken as a whole, lacks serious literary, artistic, political, or scientific value. [¶] (B) When it appears from the nature of the matter or the circumstances of its dissemination, distribution, or exhibition that it appeals to deviant sexual groups. [¶] (C) Material subject to the tests in paragraphs (A) or (B) includes, but is not limited to material that: [¶] (1) Depicts, displays, or describes penetration of the vagina or anus, or contact between the mouth and the genitals. [¶] (2) Depicts, displays, or describes bestiality, sadomasochism, or an excretory function including urination, defecation, or semen. [¶] (3) Portrays the nudity of a minor, or person who appears to be under 18 years old. [¶] (4) Portrays conduct which appears to be non-consensual behavior. [¶] (5) Portrays conduct which is or appears to be forceful, threatening, or violent. [¶] (6) Portrays conduct where one of the participants is a minor, or appears to be under 18 years old."

Subdivision (c)(15) focuses the obscenity inquiry on a three-part definition which derives immediately from state statute, and ultimately from the United States Supreme Court's decision in *Miller*, *supra*, 413 U.S. at p. 24. The test in section 3006 is taken almost verbatim from Penal Code section 311, subdivision (a), which defines "obscene" for purposes of criminal penalties: " 'Obscene matter' means matter, taken as a whole, that to the average person, applying contemporary statewide standards, appeals to the prurient interest, that, taken as a whole, depicts or describes sexual conduct in a patently offensive way, and that, taken as a whole, lacks serious literary, artistic, political, or scientific value."[8] This test incorporates only "hard-core" pornography, including

---

[8] The prison regulation omits the reference to "patently offensive" depictions and descriptions. Because we find the definition of obscenity under Penal Code section 311 is implicitly incorporated in the definition of "obscene" in section 3006, we conclude that section 3006 authorizes exclusion of only "patently offensive" material.

10

*Miller*'s list of depictions of specific conduct: " 'ultimate sexual acts, normal or perverted, actual or simulated,' and 'masturbation, excretory functions, and lewd exhibitions of the genitals.' " (*Bloom v. Municipal Court, supra,* 16 Cal.3d 71, 81.) Penal Code section 311 is itself patterned after, and incorporates but actually narrows, *Miller*'s test separating protected speech from obscenity. (*People v. Powell* (2011) 194 Cal.App.4th 1268, 1289-1290 [same language in Pen. Code, § 313]; *Brian T. v. Pacific Bell* (1989) 210 Cal.App.3d 894, 902.) There, distinguishing obscenity from protected First Amendment speech, the Supreme Court held: "The basic guidelines for the trier of fact must be: (a) whether 'the average person, applying contemporary community standards' would find that the work, taken as a whole, appeals to the prurient interest [citation]; (b) whether the work depicts or describes, in a patently offensive way, sexual conduct specifically defined by the applicable state law; and (c) whether the work, taken as a whole, lacks serious literary, artistic, political, or scientific value." (*Miller, supra,* 413 U.S. at p. 24.) Section 311 arguably defines as obscene an even narrower class of publications by applying the "taken as a whole" requirement to all three prongs of the *Miller* test. (See *People v. Powell, supra,* at pp. 1289-1290.)

Both parties focus their briefing in large part on whether the prison could lawfully restrict petitioner's right to read The Silver Crown applying the four-part test of *Turner v. Safley, supra,* 482 U.S. 78. We are aware that prisoners' constitutional rights may be restricted in the interest of legitimate penological goals. (*Id.* at p. 89; *Thornburgh v. Abbott* (1989) 490 U.S. 401, 403-404; *Pell v. Procunier* (1974) 417 U.S. 817, 822; *Bailey v. Loggins* (1982) 32 Cal.3d 907, 920; Pen. Code, § 2600; see also *Thompson v. Patteson* (5th Cir. 1993) 985 F.2d 202, 205-207 [sexually explicit material, though not legally obscene, may constitute contraband in prison]; Calvert & Murrhee, *Big Censorship in the Big House—A Quarter-Century After Turner v. Safley: Muting Movies, Music & Books Behind Bars* (2012) 7 Nw. J. L. & Soc. Pol'y 257, 263-264.) Prison incursions on the rights of prisoners are limited primarily by the reasonableness of the relationship between the adopted means and the asserted legitimate penological goals, and by the caveat that prison officials must not act in an exaggerated response to

11

perceived security and safety concerns. (*Turner v. Safley*, *supra*, 482 U.S. at pp. 87, 89-90; *Pell v. Procunier*, *supra*, 417 U.S. at pp. 822, 827.) And a regulation may also be challenged under *Turner* if it has been applied in an arbitrary and capricious manner so that, as applied, it is not reasonably related to legitimate penological interests. (See *Turner v. Safley*, *supra*, 482 U.S. at p. 100; *Shaw v. Murphy* (2001) 532 U.S. 223, 232.)

But we find it more productive to address the obscenity issue from the perspective of the rights the Legislature has specifically guaranteed to inmates in California's prisons, including the right to read. The immediate question before us is not whether the California Legislature or penal authorities *could* lawfully place otherwise unconstitutional restrictions on prisoners' First Amendment rights by limiting their access to sexually explicit material, but the extent to which they *in fact* have done so. We answer that question favorably to petitioner, agreeing with his interpretation of the statutes and regulations. And we conclude that the prison failed to comply with section 3006, subdivision (c)(15)(A), in determining that The Silver Crown was obscene contraband, and that its confiscation of the book for violent content was an arbitrary and capricious application of the regulation, given the presence of more violent books in the prison's own library.

### Prisoners' Rights to Reading Material

Penal Code section 2601, sometimes called the "Inmate Bill of Rights," specifies prisoners' "guaranteed rights," including their rights to reading material: "Subject only to the provisions of that section, each person described in Section 2600 shall have the following civil rights: [¶] . . . [¶] (c) (1) To purchase, receive, and read any and all newspapers, periodicals, and books accepted for distribution by the United States Post Office. Pursuant to this section, prison authorities may exclude any of the following matter: [¶] (A) Obscene publications or writings, and mail containing information concerning where, how, or from whom this matter may be obtained. [¶] (B) Any matter of a character tending to incite murder, arson, riot, violent racism, or any other form of violence. [¶] (C) Any matter concerning gambling or a lottery."

In determining the meaning of this statute and the regulation implementing it, we employ our own independent judgment. We review de novo "purely legal issues such as statutory interpretation." (*Snow v. Woodford*, *supra*, 128 Cal.App.4th at p. 393.)

## Obscenity

One question before us is what the Legislature meant by "obscene publications or writings" in Penal Code section 2601. Our answer is the Legislature intended to allow prisoners to receive and read any material that does not qualify as "obscene" under the definition contained in Penal Code section 311. The Legislature did not give CDCR authority to define "obscene publications or writings" more broadly.

Obscenity is not protected by the First Amendment. (*Miller, supra*, 413 U.S. at p. 36.) But defining what is obscene is a notoriously difficult task. Justice Potter Stewart's famous observation, "I know it when I see it" (*Jacobellis v. Ohio* (1964) 378 U.S. 184, 197), besides being an unsatisfactory solution, is not necessarily as foolproof as it sounds. The modern test of obscenity traces back to *Miller, supra*, 413 U.S. 15, 24. "In evaluating the free speech rights of adults, [the Supreme Court has] made it perfectly clear that 'sexual expression which is indecent but not obscene is protected by the First Amendment.' " (*Reno v. ACLU* (1997) 521 U.S. 844, 874.)

Although Penal Code section 2601 does not define "obscene," Penal Code section 311 does, as quoted above. We presume the Legislature was aware of that definition and used the word "obscene" advisedly. (See *In re Greg F.* (2012) 55 Cal.4th 393, 407.) By 1994, when Penal Code section 2601 subdivision (c), was amended to preclude inmate access to "obscene publications or writings,"[9] *Miller* was well established as the law governing obscenity, with the terms "obscene" and "obscenity"

_____

[9] Prior to 1995, Penal Code section 2601, subdivision (c), did not restrict prisoners' access to obscenity at all. The obscenity and violence provisions were contained in an amendment passed in 1994. (Stats. 1994, ch. 555, § 2, p. 2822.) Prior to that amendment, inmates' reading was restricted only insofar as it "describe[d] the making of any weapon, explosive, poison, or destructive device," or "depict[ed], portray[ed], or describe[d] a sexual assault upon a correctional employee." (Former Pen. Code, § 2601, Stats. 1975, ch. 1175, § 3, p. 2898; Stats. 1986, ch. 1177, § 1, p. 4176.)

having long since acquired the status of terms of art. (*Hamling v. United States* (1974) 418 U.S. 87, 118.)

Indeed, CDCR itself has treated Penal Code section 2601's reference to "obscene publications or writings" as encompassing the test of obscenity under Penal Code section 311. Section 3006, subdivision (c) was amended by CDCR on January 3, 1995 to implement the restrictions imposed by the 1994 amendment to Penal Code section 2601.[10] "Obscene material means material that is defined in Penal Code section 311and may include but is not limited to the following,"[11] after which the regulation specifies categories of potentially restricted materials similar to those now contained in subdivision (c)(15)(C)(1)-(C)(6). (Former § 3006, subd. (c)(14), effective Jan. 3, 1995.) CDCR also adopted an operating procedure incorporating the three-part test of obscenity contained in Penal Code section 311 and section 3006, subdivision (c)(15)(A). (CDCR, Adult Institutions, Programs, and Parole Operations Manual, section

---

[10] "The director [of CDCR] may prescribe and amend rules and regulations for the administration of the prisons . . . ." (Pen. Code, § 5058, subd. (a).) But Government Code section 11342.2 requires regulations promulgated by state agencies to be consistent with the statutes they are designed to implement: "Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute." Thus**,** a prison regulation that would impinge upon a prisoner's "guaranteed rights" under Penal Code section 2601 would overstep the regulation-making power of CDCR. " ' "[F]inal responsibility for the interpretation of the law rests with the courts.' [Citation.] Administrative regulations that alter or amend the statute or enlarge or impair its scope are void and courts not only may, but it is their obligation to strike down such regulations." ' " (*California Assn. of Psychology Providers v. Rank* (1990) 51 Cal.3d 1, 11; see also, *Batt v. City and County of San Francisco* (2010) 184 Cal.App.4th 163, 168-169 [applying same analysis to Tax Collector's "guidelines"].)

[11] The regulation was amended in 1996 to its current form and numbering. The amendment deleted the incorporation by reference of the standards of Penal Code section 311, and instead incorporated those standards almost verbatim. (See fn. 9, *ante*, and accompanying text.)

14

54010.15, available online at http://www.cdcr.ca.gov/ Regulations/Adult_Operations/ docs/DOM/DOM%202013/2013%20DOM.PDF.)

We therefore conclude that both the Legislature and CDCR intended *only* obscene materials as defined in Penal Code section 311, not otherwise sexually explicit materials, could be withheld under the statute and regulation. But we are troubled by the manner in which the regulation was applied in this case.

### *Pelican Bay Operational Procedure No. 806*

In addition to the foregoing statutes and regulations, Pelican Bay has its own Operational Procedures, one of which deals with obscenity. Operational Procedure No. 806, Personal Property Plan, Section VI-F-6 (see fn. 5, *ante*), provides in part: "Except as authorized by institutional head, inmates shall not possess or have under their control matter which contains or concerns any of the following: Obscene material. Obscene material means material taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest, when it appears from the nature of the matter or the circumstances of the dissemination, distribution, or exhibition that it appeals to deviant sexual groups. The material includes, but is not limited to material that depicts, displays, or describes penetration of the vagina, or sexually explicit images that display frontal nudity in the form of personal photographs, drawings, magazines, or other format. Sexually explicit material shall be defined as material that shows frontal nudity of either gender, including the exposed female breasts or genitalia of either gender." (Pelican Bay Operational Procedure No. 806, Personal Property Plan, Section VI-F-6 at pp. 13-14.)

Here, we see a departure from the three-part test. The Pelican Bay Operational Procedure appears to eliminate—certainly, not to ensure the application of—the three-part test of *Miller*, Penal Code section 311, and section 3006, subdivision (c)(15)(A). We find the Operational Procedure problematic for this reason, and we fear it may, in effect, authorize Pelican Bay employees to withhold from inmates materials that may not properly be classified as obscene because they have "serious literary, artistic, political or scientific value." To the extent the guidelines established by

15

current section 3006, subdivision (c)(15)(C)(1)-(C)(6), have been understood by individuals within CDCR, or specifically at Pelican Bay, to establish hard-and-fast categories of "obscene" material without further analysis, they have been misconstrued. Subdivision (c)(15)(C)(1) expressly provides that material which "[d]epicts, displays, or describes penetration of the vagina or anus, or contact between the mouth and the genitals" is "*subject to the tests* in paragraphs (A) or (B)." (Italics added.) The list is not intended to *supplant* the three-part test under subdivision (c)(15)(A), nor is it meant to categorically *expand* the definition of obscenity contained in subdivision (c)(15)(A).[12]

### *Application of the statutes and regulations by prison authorities*

We see nothing in the procedures actually employed to suggest that prison staff understood their obligation to consider the literary value of the book as a whole before declaring it to be contraband. Both the first and second level reviews made specific reference to, and quoted, ambiguous and incomplete Pelican Bay Operational Procedure No. 806. This quotation of the Operational Procedure may, in part, explain why they seem to have overlooked the "serious literary value" prong. The fact that prison authorities withheld petitioner's book because sexually explicit descriptions were "present" or "contain[ed]" within it further suggests they failed to consider the literary value of the work "taken as a whole" as required under subdivision (c)(15)(A). By so doing, they also failed to respect petitioner's rights under Penal Code section 2601, subdivision (c)(1).

The Attorney General fails entirely to appreciate the problem, and instead seems to argue in favor of a categorical exclusion of all sexually explicit materials falling within subdivision (c)(15)(C)(1)-(C)(6). She argues, for instance, that even if The Silver Crown "has some redeeming literary value, it would not justify releasing the book to Martinez, as this exception would swallow the rule. Moreover, prisons may expand the definition for obscenity when evaluating material viewed by inmates."

---

[12] Alternatively, materials identified in subdivision (c)(15)(C)(1)-(C)(6) may be subjected to the test specified in subdivision (c)(15)(B), but that subdivision does not apply to our case.

16

We cannot agree that prison authorities may simply overlook the third prong of the obscenity test or that they may "expand," without legislative approval, the category of materials subject to exclusion from prisons beyond that authorized by Penal Code section 2601. We also part company with *Johnson*, *supra*, 176 Cal.App.4th 290, to the extent it suggests that subdivision (c)(15)(C) somehow "expands" the definition of what constitutes "obscene material" for purposes of prison administration. (*Id.* at p. 301 [subdivision (c)(15)(A) is "refined" by subdivision (c)(15)(C), and together they represent an "expanded definition of obscenity"].) As we see it, subdivision (c)(15)(C) is the beginning point of the analysis, not the end. The reference back to subdivision (c)(15)(A) clearly calls for application of the three-part test, including an assessment of literary value.

There is no support in the record of administrative action to suggest the authorities moved on to the third step of the analysis—and much to suggest they did not.[13] The only reference in the record to which the Attorney General points as encompassing a finding of "no serious literary value" is this statement made in the first level review: "the book in question does not meet any of the criteria that would allow it to be issued." This amorphous statement is insufficient to constitute a finding on the third prong of the obscenity test because no reference to literary value is made whatsoever. Moreover, it appears to misplace the burden of proof, as it is clear from the regulation that the prison must bear the burden of showing the publication *lacks* serious literary value, not the inmate who must show that the book *has* serious literary value.

Given the foregoing factors, we find the third prong of the test required by subdivision (c)(15)(A) was never applied by the CDCR representatives in the case before

---

[13] Petitioner includes details about his interview with prison officials concerning his administrative appeals. These allegations strongly suggest the prison applied subdivision (c)(15)(C)(1) and (C)(2) without then applying the three-prong test of subdivision (c)(15)(A). Respondent denied these facts, professing to have insufficient information to respond further. We find it unnecessary to determine these facts because we are convinced by the written record alone that subdivision (c)(15)(A) was not properly applied by the prison authorities.

17

us. Thus, the decision to exclude The Silver Crown from petitioner's possession constituted a misapplication of the governing regulation and statute.

The Attorney General urges us to defer to the judgment of the prison authorities regardless, citing cases holding that courts ordinarily do defer to prison authorities on questions of prison discipline, classification, gang designation, parole, and the like, applying the deferential standard of review asking only whether the authorities' action was supported by "some evidence." (*In re Shigemura* (2012) 210 Cal.App.4th 440, 451-452; *In re Morganti* (2012) 204 Cal.App.4th 904, 916-917; *Johnson*, *supra*, 176 Cal.App.4th at pp. 295, 299 [discipline based on possession of "obscene" matter].) But the some evidence standard would not apply, as the standard of review in cases involving obscenity is de novo. (*In re George T.* (2004) 33 Cal.4th 620, 632; *Zeitlin v. Arnebergh* (1963) 59 Cal.2d 901, 909).

Thus it is appropriate we address the question of serious literary value ourselves, the question to which we now turn.

### *Serious literary value*

Our analysis begins with a more detailed description of the plot of The Silver Crown, set primarily in the town of Oxford, England: The Silver Crown is a group of 12 elite and especially powerful werewolves (Ancient Beasts), one of which has been killed by Iris. Mistakenly believing he was killed by Alfie, Iris's werewolf boyfriend, the remaining 11 search for Alfie, ostensibly to put him on trial as a traitor. Witches, meanwhile, have prophesied that Iris will kill the Silver Crown.

Iris herself has a motive of revenge against werewolves because one of them killed her brother years earlier. She and Alfie were a couple when Alfie was still human; Alfie apparently was attacked by a werewolf and transformed into one at the same time Iris's brother was killed. After her brother's death, Iris joined together with Blake to become a werewolf hunter, while Alfie disappeared into his new werewolf life. Blake and Iris eventually married, but when Alfie reappeared in Iris's life, Iris left Blake for Alfie. Alfie, for the love of Iris and out of remorse for the damage he had done to others, joins forces with the werewolf hunters, torn between two worlds. In the end, Iris risks her life

18

to rescue Alfie, only to find there may be another influence over him more powerful than his love for her.

Several other werewolves (Alfie's pack) populate the cast of characters, all inter-related through complex and conflicting loyalties that exist between a new werewolf and the werewolf who bit (and thereby transformed) him or her. These are the complexities, the reader is told, of the "sire-cub" relationship. The werewolf pack in some ways mimics a familial system. Intense emotions, both positive and negative, characterize the relationships among werewolves within and without the pack, including a love-hate relationship between some of the characters. Themes of love, divided loyalty, destiny, transformation, betrayal, and revenge run through the novel.

Granted, we are dealing with a book, isolated passages of which, standing alone, may be considered sexually offensive. The question then becomes whether the work "as a whole" may be said to lack "serious literary value" because it is interlaced with pornography. (*Miller*, *supra*, 413 U.S. at p. 24.)

As the Supreme Court has said, "A quotation from Voltaire in the flyleaf of a book will not constitutionally redeem an otherwise obscene publication . . . ." (*Kois v. Wisconsin* (1972) 408 U.S. 229, 231.) "[A] truly pornographic film would not be rescued by inclusion of a few verses from the Psalms." (*United States v. A Motion Picture Film Entitled* I Am Curious-Yellow (2d Cir. 1968) 404 F.2d 196, 201 (conc. opn. of Friendly, J.).) And obscene videos do not have "serious" social value simply because the participants wear condoms and the films occasionally remind viewers to practice "safe sex." (*United States v. Schein* (3d Cir. 1994) 31 F.3d 135, 137.)

On the other hand, "[w]here the scene is part of the narrative, the work itself does not for this reason become obscene, even though the scene in isolation might be offensive." (*Ashcroft v. Free Speech Coalition* (2002) 535 U.S. 234, 248; see also, e.g., *Powell's Books, Inc. v. Kroger* (9th Cir. 2010) 622 F.3d 1202, 1214 [coming-of-age novel does not become obscene for minors simply because it includes explicit sexual scenes]; *People v. Dyke* (2009) 172 Cal.App.4th 1377, 1386 [where the context of

television scenes shown to minor was not clear, there had been no showing of lack of serious value, and conviction under Pen. Code, § 288.2, subd. (a) had to be reversed].)

When, then, does a work which contains both literary speech and some offensive sexual content lose its "literary value" and become contraband in prison?

To begin with, we cannot simply dismiss the work as nonserious literature because it deals with werewolves and other paranormal creatures and activities. For better or worse, some segment of the population is fascinated by werewolves and other mythical beings, as most recently shown by the Twilight (Summit Entertainment 2008) movies. Werewolves, in fact, have played a role in popular fiction for centuries[14] and became a popular subject of the cinema, including the early films Werewolf of London (Universal Pictures 1935) and The Wolfman (Universal Pictures 1941). Whether contemporary readers drawn to this genre actually believe in werewolves, whether they see in such works a metaphor for some kind of human transformation, or whether they simply read werewolf literature as escapist fantasy, the fact remains that werewolf literature retains a place in modern American and European society.

Having determined the work has some societal value, how does one judge whether it has "serious" literary value? "[E]ven after years of federal obscenity jurisprudence, there has arisen no set, uniform standard by which courts may discern whether a work has serious 'literary, artistic, political or scientific value.' " (Note, *The Auto-Authentication Of The Page: Purely Written Speech And The Doctrine Of Obscenity* (2011) 20 Wm. & Mary Bill of Rts. J. 253, 273 (*Auto-Authentication*); see also, Main, *supra*,11 S. Ill. U. L.J. at pp. 1162-1174.)

The Supreme Court has most recently discussed the concept of "serious" value in *United States v. Stevens* (2010) 559 U.S 460[130 S.Ct. 1577] (*Stevens*).[15] *Stevens,* which was not an obscenity case, involved a challenge to the constitutionality of 18 United

---

[14] See Frost, The Essential Guide to Werewolf Literature (2003) at pp. 50-105.

[15] Opinion by Roberts, C.J., joined by Stevens, Scalia, Kennedy, Thomas, Ginsburg, Breyer, and Sotomayor, JJ. Alito, J., in dissent defined "serious" as "not 'trifling.' " (*Stevens*, *supra*, 559 U.S. at p. __ [130 S.Ct. at p. 1595].)

States Code section 48, which outlawed depictions of animal cruelty. (*Stevens, supra,* 559 U.S. at p. __ [130 S.Ct. at p. 1582].) The statute included an exception for "any depiction that has serious religious, political, scientific, educational, journalistic, historical, or artistic value." (*Id*. at p. __ [130 S.Ct. p. 1590.)

Addressing an overbreadth argument, the Court said: "The Government's attempt to narrow the statutory ban, however, requires an unrealistically broad reading of the exceptions clause [i.e., "serious" value clause]. As the Government reads the clause, any material with 'redeeming societal value,' [citation] ' "at least some minimal value," ' [citation] or anything more than 'scant social value,' [citation] is excluded under § 48(b). But the text says 'serious' value, and 'serious' should be taken seriously. We decline the Government's invitation— advanced for the first time in this Court—to regard as 'serious' anything that is not 'scant.' (Or, as the dissent puts it, ' "trifling." . . .) As the Government recognized below, 'serious' ordinarily means a good bit more. The District Court's jury instructions required value that is 'significant and of great import,' [citation] and the Government defended these instructions as properly relying on 'a commonly accepted meaning of the word "serious," '. . ." (*Stevens*, *supra*, 559 U.S. at p. __ [130 S.Ct. at p. 1590].)

Personally, we would be hard-pressed to say The Silver Crown has "significant" literary value and is a work "of great import." The majority opinion in *Stevens*, however, merely recited as a fact of record the jury instructions ascribing to the phrase the meaning " 'significant and of great import.' " (*Stevens, supra,* 559 U.S. at p. __ [130 S.Ct. at p. 1590.) It did not purport to establish a definition of the word "serious." And we do not read it as a mandate equating "serious" with "significant" and "of great import" in the obscenity context.

Indeed, we question whether we should judge the superior or inferior literary merit of the book at all. We suspect it is the *nature* of the work rather than its *quality* that lends it "serious literary value." In other words, we attempt to determine whether the book is *serious* literature, not whether it is *good* literature.

We start with the observation that we deal with words alone and no other depictions. While the Supreme Court has made clear that words as well as pictures may be deemed obscene (*Kaplan v. California* (1973) 413 U.S. 115, 118-119), many of the obscenity cases deal with photographs, magazines, and films, where the portrayal is visual and, at least from an objective perspective, uniform to all observers. With the written word, however, the images come to fruition only in the mind of the reader, and it is arguable that purely literary works without illustrations or photographs are less amenable to regulation as obscenity. (See *Auto-Authentication*, *supra*, 20 Wm. & Mary Bill of Rts. J. at pp. 263-269.)

Nevertheless, it is perhaps easier to apply Justice Stewart's "I know it when I see it" test to a picture than it is the corollary we must consider in this case: Do we know it when we read it? We find it harder to dismiss a novel-length work of fiction as lacking in literary value than we might find it to so dismiss a magazine containing obscene photographs.

Indeed, the prison regulation itself places images in a more restricted category than the written word.[16] (See § 3006, subd. (c)(17).) *Snow v. Woodford*, *supra*, 128 Cal.App.4th 383, upheld the constitutionality of subdivision (c)(17), which was added in 2003, and which prohibits inmate access to images of frontal nudity.[17] Doing

---

[16] Compare § 3006, subdivision (c)(15)(C)(1)-(C)(6), making written works subject to the test in subdivision (c)(15)(A), with subdivision (c)(17), forbidding "[s]exually explicit images that depict frontal nudity in the form of personal photographs, drawings, magazines, or other pictorial format," without reference back to subdivision (c)(15)(A).

[17] Although it is true that *Snow* found the regulation on its face did not violate Penal Code section 2601, it relied upon CDCR's regulation-making authority to effectuate subdivision (c)(1)(B) of that statute, finding CDCR's adoption of a complete ban on images of frontal nudity was within the department's authority to exclude material that " 'might have a tendency to incite violent situations.' " (*Snow, supra,* 128 Cal.App.4th at p. 394, citing Pen. Code, § 2601, subd. (c)(1)(B).) The prison's explanation for the regulation when it was added in 2003 included representations that nude images increased harassment of female prison staff and possible anatomical comparisons that could lead to fights between inmates. (*Id*. at p. 388.) We deal, of

so, the court distinguished pictures from words, noting the regulation "does not ban sexually explicit writings." (*Id*. at p. 393; see also *Frost v. Symington* (9th Cir. 1999) 197 F.3d 348, 357 [Arizona prison regulation banning depictions of sexual penetration did not ban "sexually explicit articles"]; *Mauro v. Arpaio* (9th Cir. 1999) 188 F.3d 1054, 1057-1060 [approving similar jail regulation for pretrial detainees]**;** *Amatel v. Reno* (D.C. Cir. 1998) 156 F.3d 192, 202 [commenting that a similar federal regulation (28 C.F.R. § 540.72) "by its terms only restricts pictures; a prisoner may *read* anything he pleases"].)

We turn, then, to the evidence before us on the issue of literary value. As noted, as one of the exhibits to his traverse, petitioner submitted the declaration of Peter Orner, a creative writing instructor at San Francisco State University who has also taught at other institutions, written books, and received various literary awards for his work. Orner opines that The Silver Crown has "literary merit." In his words, "It's not pornographic, it's erotic fiction that centers around a relationship that consists of yes, a lot of sex but also love too. The book has a plot, a theme. Freedom, I would say is the main theme, a woman freeing herself from the confines of her set life—Alfie represents a kind of freedom she never had with her husband Blake. The complication, of course, is that he is a werewolf and a relationship with him interferes with her professional responsibility. This involves a universal problem: you have a certain responsibility to be one person, but life comes along and changes you. . . . Further, the characters have a certain depth, personalities that make [them] distinct. . . . The book has what I would call forward momentum, including plot twists, surprises, and a sense of resolution at the end, which leaves the door open to further adventures."

Orner continues: "*The Silver Crown* is a fantasy story, one that transports us into other worlds. Again, the characters have sex but the book is about more than sex. As I said above, it seems to me that the book is an exploration of the confines of a certain

course, with a different subdivision of section 3006, enacted at a different time, in an "as applied" challenge, and in a case where the warden has not argued that explicit sexual content is banned under subdivision (c)(17), but under (c)(15).

society, one that is in some ways similar to our own but that also contains magical elements. It's about freeing oneself from one's greatest fears, and in this way this is clearly a work of literature. It's not Tolstoy, fine, but this author knows how to move story, carry out a plot, with a theme, and how to give her characters a certain depth characteristic of literary fiction." While Orner does not say the work has "serious" literary value, such a finding could be derived from his declaration.[18]

Significantly, the warden has submitted no contrary expert evidence that the work lacks serious literary value.[19] In similar circumstances, *Luke Records v. Navarro* (11th Cir. 1992) 960 F.2d 134, 138-139, held that where an expert testified that a rap album had serious value, the government's failure to present controverting evidence required reversal of an obscenity finding.

Instead of presenting expert literary opinion, as discussed above, the Attorney General submitted the declaration of correctional officer Graves that he considered the "serious literary value" factor in determining The Silver Crown was contraband. But we have no clue what criteria or reasoning he used in reaching any such decision, and his own description of his process leads us to doubt that he applied any such test at all.[20]

In line with the expert opinion, we too note that Madden's book employs techniques recognized as literary devices. (*Auto-Authentication*, *supra*, 20 Wm. & Mary

---

[18] Madden also apparently won some sort of award as an erotic writer. The book cover describes her as the "The Erotic Awards Writer of the Year 2007," and contains positive critical comments about her previous works. These factors contribute to a finding that the book has "serious literary value."

[19] While expert opinion is not required in obscenity cases, it is allowed. (Pen. Code, § 312.1.)

[20] Graves' declaration says that he considers a book "as a whole" when he reviews it pursuant to section 3006 and that he considers "whether the book, taken as a whole, lacks serious literary, artistic, political, or scientific value." However, here is how he describes the exact process he follows: "My process is to thumb through pages of the book to read various excerpts and if I continue to come across sexually explicit depictions or descriptions that intend to appeal to the prurient interest of the reader, that book as a whole would meet the criteria of obscene contraband." This description hardly reassures us that he or other prison officials consider the literary value of the work as a whole.

Bill of Rts. J. at p. 274; see *Memoirs v. Massachusetts* (1966) 383 U.S. 413, 419.) The plot unfolds from the points of view of at least three character groups: (1) Iris, Alfie, Blake (and related characters), (2) Leon and his packmates, and (3) Sabrina and the Silver Crown. These three viewpoints are developed simultaneously throughout the novel, interspersed between or within chapters. The characters are developed to a degree, with distinctive personalities, though deep introspection is lacking. Dialogue is employed to move the plot forward. There is frequent retrospective reference so as to fill the reader in on past events, most of which presumably were explored more fully in the first book of the trilogy. And though perhaps less than Shakespearean, a ghost of Iris's dead brother appears in various scenes, especially to provide guidance to Iris in times of strife. The Silver Crown ends on an uncertain note, with the promise "To be continued" as the final words of the book. This undoubtedly was intended to build suspense and whet the reader's appetite for the third book of the trilogy.

In addition, judged quantitatively, the amount of offensive material in The Silver Crown is smaller than the portion of the book carrying forward the nonoffensive plot. (See *State v. Walden Book Co.* (La. 1980) 386 So.2d 342, 345 [228-page magazine had 96 pages lacking serious value].) This is not a book in which a minimal amount of literary material has been added as a sham to attempt to constitutionalize otherwise unprotected obscenity. While we have not calculated a page-by-page comparison, it is clear that the number of pages devoted to sexually explicit material is a minority of the overall text. The sexual scenes in The Silver Crown are also thematically related to the rest of the book. Considerable effort went into the creation of the book, and the plot is more than a sham. (*Ibid.*)

For the foregoing reasons, we find The Silver Crown does not lack serious literary value and thus should not have been withheld from petitioner on grounds of obscenity. We feel certain the book should be protected by the First Amendment in ordinary commerce, and our analysis of Penal Code section 2601 concludes it is therefore allowable reading for inmates.

## Violence

As noted, in the first level administrative appeal the prison authorities cited section 3006, subdivision (c)(1), which defines as contraband "[a]ny matter of a character tending to incite murder; arson; riot; or any form of violence or physical harm to any person, or any ethnic, gender, racial, religious, or other group." Not all books containing descriptions of violence are forbidden to inmates. Only those that *tend to incite* violence are prohibited. The Silver Crown does not fall into that category. Indeed, we find some facts relied upon by the prison and the superior court amount to a misreading of the text.[21]

Although The Silver Crown includes some violence within the plot line, it is not gratuitous or particularly graphic. And it does not *advocate* or tend to *incite* violence. Werewolves attack humans. Werewolf hunters kill werewolves. There is no morbid fixation on violence. In fact, most of the violence in the book is committed by or against mythical creatures, not humans.

Moreover, the descriptions of killing and violence are in a matter-of-fact way. For instance, the killing of one werewolf is described as follows: " 'Thank you, Aurelia,' Blake said, as he raised his gun and shot her between the eyes." Another example: "Iris's dart hit the grey [wolf] and he went down." One of the most violent passages in the book

---

[21] The prison cited one particular passage in the book in claiming it was contraband under the violence standard: "the book in question also advocates violence because it describes ripping at a decapitated mans [*sic*] head and other violent killings." This is an inaccurate description of the book's content. There is no description of anyone "ripping" at a decapitated head. The passage dealing with the decapitated head reads as follows: "The dark-haired man was decapitated. His head two feet away from his body. The wolf was standing on the blond's chest ripping at his face." And the "ripping" was committed by a wolf, Alfie in his wolf state.

The superior court also inaccurately described a part of the book when it said, "The five-page, first chapter describes a woman having oral sex and intercourse with another werewolf before she intentionally shoots him in the leg and then, after more dialogue, administers the *coup de grace* with a silver bullet." The first part of the sentence is accurate, but the woman does not kill the werewolf (Leon), with a silver bullet or otherwise. He appears as a character through the remainder of the book.

is when Iris begins to fulfill the witches' prophecy by killing several of the Ancient Beasts, a passage we quote in the margin.[22]  Although it describes a violent scene, the violence is muted, not exploited.

Again, we are urged by the Attorney General to defer to prison authorities in deciding what kind of material is likely to "incite violence" in a penal institution.  We would be inclined to do so, but we have reviewed excerpts from other books contained in Pelican Bay SHU's general library and find this book no more violent than the others.  For example, in Inner City Hoodlum, Donald Goines portrays the death of Josh, a young petty thief, killed by Wilbur Mann, a white security guard who caught Josh looting a

---

[22] "Iris raised the bow and took aim.  One Beast was down, it's [*sic*] throat slashed by Pure's blade.  But Pure was on the ground, the other three Beast's [*sic*] surrounding him.  Iris fired.

"And, oh, the crossbow was amazing.  If holding it had felt good, firing it was orgasmic.  It seemed to respond to her will, like a lost part of her.  She took one of the Beasts down with her first bolt.

"Two left. One was on Pure's chest, the other was looking at her, readying itself for attack.  Iris aimed.  But this bolt only hit the creature's leg.  It didn't flinch.

"*Still need a fatal shot, Iris*.

"The crossbow only took two bolts at a time.  Iris scrambled in her pocket for more and reloaded.  By the time she was ready to fire again the wolf had decided to spring.  She caught it in mid-air.  It crashed to the floor so hard the whole cavern seemed to shake.

"As Iris whirled around to finish off the final wolf her heart stopped.  Pure was on the ground beneath it.  The side of his face was covered in blood.  Iris screamed.  She ran towards the wolf, aiming and firing as she went.  The bolt slammed into it almost as Iris thought it.  The wolf fell and Iris landed on her knees next to Pure.

"Pure looked at her.  'It bit me,' he said.

"Iris looked Pure right in the eyes.  'Yes,' she said.  His face.  It wasn't a fatal bite. Iris pulled the crossbow bolt out of the dead Beast lying next to them.  She took Pure's hand in hers and with the other slammed the crossbow bolt right into his chest."

boxcar.  Mann screams at Josh, "You fuckin' little nigger boy!" and then shoots him dead with his .38.  Again, we quote the text in full in a footnote.[23]

We find Goines's book is more likely to incite a violent response than is Madden's.  It is more realistic, as the killings are perpetrated with weapons in current circulation. The wounds are described in greater detail, which tends to create a more vivid image in the mind.  The author describes Mann's "joy" at having killed a young boy.  And there is an interracial element to the killing, which could tend to trigger interracial violence in prison.

By contrast, when Iris kills the Beasts as recounted above, she acts heroically to attempt to rescue Alfie.  When she kills Pure it is because he has been bitten by a werewolf and will become one if not killed by Iris.  She thus carries out an oath taken by all of the werewolf hunters to kill each other if they suffer a nonlethal bite.  Too, Iris uses a crossbow, an ancient weapon probably endowed with magical properties, not one so common as the gun or the nunchakus in Goines's book.  And the violence, like the rest of the plot, occurs in a realm of pure fantasy.

We have also reviewed an excerpt from Chainfire by Terry Goodkind, copied by hand by petitioner as an exhibit to his petition, which is available in the Pelican Bay SHU

---

[23] "The shot was fired directly into Josh's tear-stained cheek, tearing away the entire left side of his skull.  The second shot entered his neck and ripped the muscles and cords out of his body.  As his skinny little body flew backward into the dark recesses of the boxcar, Josh's skull and throat were being splattered against the boxes of imported watches."

Mann "was at that moment seething with a kind of angry joy at what he had done.  For those brief moments, he had come to be the man once again.  The kid inside the boxcar was dead, and he, Wilbur Mann, had killed him.  The kid was a nigger and that had made it even better."

But Josh's friend gets even: "Buddy knew it was the most powerful thrust he had ever made with his [nunchaku] sticks.  Every part of him was there, adding to the strength of his swing.  The sticks came down directly at the center of the guard's cap and the sickening sound of the man's skull being crushed turned Bobby's stomach.  [¶] 'Oh my God!' Johnny ran up at that moment behind Buddy.  The nunchaku was embedded in the dead man's skull, and Buddy was struggling to pull it free.  Johnny watched in horror, then saw the remains of Josh."

general library. We will not quote its contents, but we find the excepts provided by petitioner far more violent and gruesome than anything contained in The Silver Crown.

By either historical or contemporary standards, the violence in The Silver Crown is not extreme. More graphic violence appears on television nightly. Since other more violent books are available to prisoners in the SHU general library, we see no reason to withhold petitioner's self-purchased book on account of its violent passages. We therefore conclude the prison authorities misapplied section 3006, subdivision (c)(1), when they withheld the book from petitioner on grounds of its violent content. The confiscation was arbitrary and capricious and not reasonably related to legitimate penological interests as applied to petitioner's book. (See *Shaw v. Murphy*, *supra*, 532 U.S. at p. 232; *Turner v. Safley*, *supra*, 482 U.S. at p. 100.)

## DISPOSITION

The petition for writ of habeas corpus is granted. The Warden of Pelican Bay State Prison is ordered to allow petitioner to receive, possess, and read his copy of The Silver Crown. We currently have possession of the book as an exhibit to the petition. The clerk of this court shall deliver the book to the Deputy Attorney General, who shall oversee its delivery to petitioner.

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Lambden, J.

A134400, *In re Martinez*

| | |
|---|---|
| Trial Court: | Del Norte County Superior Court |
| Trial Judge: | Hon. William H. Follett |
| Attorney for Petitioner: | Matthew Zwerling and L. Richard Braucher, under appointments by the Court of Appeal |
| Attorneys for Respondent: | Kamala D. Harris, Attorney General, Jennifer A. Neill, Senior Assistant Attorney General, Anya M. Binsacca, Supervising Deputy Attorney General, Stacey D. Schesser, Amanda Lloyd, Deputy Attorneys General |