[No. F055768. Fifth Dist. Aug. 4, 2009.]

In re DEMIAN JOHNSON on Habeas Corpus.

## COUNSEL

Michael Satris, under appointment by the Court of Appeal, for Petitioner Demian Johnson.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Jennifer A. Neill and Amy Daniel, Deputy Attorneys General, for Respondent State of California.

## OPINION

**WISEMAN, Acting P. J.**—The internal disciplinary system for inmates of California's Department of Corrections and Rehabilitation (Department) is one designed to maintain order and security within California's expansive penal system. Petitioner, who is serving a 15-year-to-life sentence for murder, was issued two "CDC 115's" for prisoner misconduct, neither of which resulted in the loss of custody credits. Petitioner argues that any prison discipline, which has the potential to impact negatively a parole decision, implicates due process.

We conclude that the Department's issuance of a CDC 115 itself does not invoke the right to due process and review by the courts. To the contrary, we continue to follow long-standing legal precedent, which does not allow the courts to review prison disciplinary decisions not resulting in the loss of custody credits, including those that merely impact certain day-to-day activities of prison life.

## PROCEDURAL HISTORY

Petitioner Demian Johnson is a prisoner currently serving a 15-year-to-life sentence in the custody of the Department. Johnson is challenging two of the Department's prison disciplinary decisions, which he contends have impacted his ability to obtain release on parole. Johnson has exhausted all available administrative remedies and has unsuccessfully sought relief by petition for writ of habeas corpus in Kern County Superior Court. Johnson filed this petition here on August 4, 2008. We initially sought and received an informal response from the Attorney General on behalf of the Department addressing the factual and legal bases of the discipline imposed. After consideration of the petition and the response filed by the Attorney General, we issued an order to show cause why the relief requested should not be granted. The petition for writ of habeas corpus is denied.

## FACTUAL SUMMARY

While incarcerated at Kern Valley State Prison, Johnson worked as a clerk in the prison chapel. On April 3, 2006, Johnson was searched by a correctional officer. This occurred while Johnson was standing outside his worksite. The searching officer found in Johnson's possession a bottle of correction fluid and a pen. Both items were state issued. According to the correctional officer's report, Johnson told the officer both items had been given to him by the chaplain. Johnson was issued a CDC 115 rules violation report, charging him with theft of state property. A CDC 115 is issued to a prisoner when alleged misconduct is believed to be a violation of law and not minor in nature. (Cal. Code Regs., tit. 15, § 3312, subd. (a)(3).)[1] The CDC 115 reported that the officer had confirmed with the chaplain that the chaplain had not given the items to Johnson. On April 6, Chaplain Bradley authored a 128B general informative chrono (chrono), stating that he had given the pen to Johnson, but confirming he had not given Johnson the correction fluid. The chaplain reported that, because the chapel had not received office supplies, Johnson used his "personal" office supplies to do his work. The chaplain also stated that at no time did Johnson steal the pen or the correction fluid from the chapel. Johnson claims in this court that he brought the correction fluid, along with a number of other office supplies, to Kern Valley State Prison from his last custodial assignment. A memorandum to "Facility 'C' Staff," dated April 10, 2006, is attached to the traverse as exhibit B. The memo is signed by Chaplain Bradley and the facility "C" captain, and states that Johnson is authorized at the worksite to be in possession of state-issued equipment and supplies such as pens, pencils, correction fluid, and other office supplies. There is nothing in the record to show that this was provided to the hearing officer or to others reviewing the April 5 CDC 115.

---

[1] All further undesignated references are to title 15 of the California Code of Regulations.

At the administrative hearing, Johnson stated that the correction fluid was his and the pen came from the chaplain. The hearing officer postponed the hearing to talk with the chaplain. When the hearing reconvened, Johnson attempted to offer the April 6 chrono authored by Bradley as proof he had not stolen the items found, but the hearing officer rejected it, stating that he had talked with Bradley personally and that Bradley had confirmed that he had issued the pen to Johnson, but not the correction fluid. The record of the hearing includes no explanation about where or how Johnson had obtained the correction fluid.[2] The hearing officer found Johnson guilty of theft of state property. Review of the discipline was denied by the warden who also found no due process violation in rejecting the evidence because Johnson had admitted the "state supplied" correction fluid belonged to him.

On April 26, 2006, as Johnson was leaving his worksite, he was approached by a correctional officer and asked why he was in the chapel on his day off. Johnson said that he had been at the library and that Chaplain Bradley had summoned him to the chapel to discuss chapel services. Johnson was holding a file folder of paperwork and was asked what it contained. According to the officer, Johnson said he needed the papers to work on his legal case. According to Johnson, he answered that the folder contained some chapel-related materials, some legal papers, and some personal correspondence. The folder was searched. The officer found an article allegedly from Men's Health magazine. According to Johnson, the article discussed female orgasm and included two pictures of women in underwear.[3] According to the officer, the article contained "sexually explicit materials including pictures of scantily clothed women, pages describing, in detail, sex acts, sexual positions and techniques." On the same day, Johnson was issued a second CDC 115 rule violation, charging him with possession of obscene materials in violation of section 3006, subdivision (c)(15)(A).

According to Johnson, the hearing officer at the administrative hearing on this offense admitted that he had not seen the article, but told Johnson he had been given instructions to find Johnson guilty of the rule violation. The trial court found this assertion to be unbelievable. In any event, the hearing officer found Johnson guilty of the charged offense and sustained the CDC 115. The warden denied a second level review of the second CDC 115, commenting that Johnson admitted the article discussed sexual conduct. As an exhibit to his traverse, Johnson has provided this court with a copy of an inmate request

---

[2] In the traverse to his petition, Johnson contends that he did tell the hearing officer that the correction fluid was brought with him from Salinas Valley State Prison and that he was authorized to have it. This information does not appear in the record of the disciplinary hearings or in Johnson's petition filed here or at the trial court.

[3] Johnson has asked this court to obtain and review a copy of the article. We have done so and will, on our own motion, take judicial notice of the article, entitled *Her Best Ever (Hooking Up)* by Ian Kerner, Ph.D. (July/Aug. 2005) Men's Health, pages 139–140.

form dated February 6, 2009, which he submitted asking whether Men's Health was an approved publication for inmates. Johnson was advised that "Men[']s Health is allowed on a case by case basis [de]pending [on] content."

As a result of the two disciplinary findings, Johnson was removed from his job at the chapel. On May 16, 2006, Chaplain Giron authored a chrono stating that prison staff had repeatedly harassed Johnson and interfered with his work in the chapel because they believed Johnson was not provided with sufficient supervision. The chrono praised Johnson for his hard work, professionalism, and expertise and stated that Johnson had been an asset to the chapel.

Johnson's appeal to the Department's director to set aside the disciplinary actions was denied on December 13, 2007. Johnson filed a petition for writ of habeas corpus in Kern County Superior Court in February 2008, which was denied in April 2008.

In November 2006, Johnson appeared before the Board of Parole Hearings (parole board) and stipulated to a two-year denial of parole based in part on the two disciplinary actions and the need to complete administrative and judicial review of his challenges to the disciplinary actions.

## *DISCUSSION*

### I.  *Due process implications*

■ We begin with the premise that the Legislature has given the Department broad authority to discipline persons confined in state prisons. (Pen. Code, § 5054.) Prison disciplinary proceedings occur in a highly charged atmosphere. (*Superintendent v. Hill* (1985) 472 U.S. 445, 456 [86 L.Ed.2d 356, 105 S.Ct. 2768] (*Hill*).) Relationships in a prison among inmates and guards are complex. (*In re Zepeda* (2006) 141 Cal.App.4th 1493, 1498, fn. 5 [47 Cal.Rptr.3d 172]; *In re Rothwell* (2008) 164 Cal.App.4th 160, 166–167 [78 Cal.Rptr.3d 723].) Prison disciplinary decisions are made in a closed, tightly controlled environment peopled by those who have been convicted of crimes and who have been lawfully incarcerated as a result. (*In re Zepeda, supra*, at p. 1498, fn. 5.) Although prisoners do not lose all rights at the prison gate, " '[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system.' " (*Jones v. North Carolina Prisoners' Union* (1977) 433 U.S. 119, 125 [53 L.Ed.2d 629, 97 S.Ct. 2532], quoting *Price v. Johnston* (1948) 334 U.S. 266, 285 [92 L.Ed. 1356, 68 S.Ct. 1049].)

■ The due process clause does not, standing alone, confer a protected interest in preventing adverse state action during incarceration, nor does it protect against every change in the conditions of confinement having an adverse impact on the prisoner. (*Sandin v. Conner* (1995) 515 U.S. 472, 485 [132 L.Ed.2d 418, 115 S.Ct. 2293].) Prison regulations, including a prison's disciplinary code, are primarily designed to guide prison officials in the administration of the prison and are not designed to confer basic rights upon the inmates. (*Id.* at pp. 482–483.) Generally, prison discipline falls within the expected parameters of the sentence imposed by a court of law and does not implicate the due process clause or create the right to judicial review. (*Ibid.*) To this end, courts must grant great deference to a prison's decision to impose discipline against an inmate. (*In re Rothwell, supra,* 164 Cal.App.4th at p. 167.) It is only when prison officials act to deprive an inmate of life, liberty, or property in a manner that falls outside the expected parameters of the sentence imposed that the Fourteenth Amendment due process clause is invoked. (*Sandin v. Conner, supra,* 515 U.S. at p. 485; *In re Estrada* (1996) 47 Cal.App.4th 1688, 1699 [55 Cal.Rptr.2d 506].)

■ We conclude that Johnson has not established that he has been deprived of any right that invokes due process protection. We know of no California decision holding that disciplinary decisions that do not result in a denial of custody credits or otherwise invoke due process guarantees because they fall outside the expected parameters of the sentence imposed are subject to judicial review. Johnson relies upon a line of cases that allows for judicial review of internal disciplinary decisions when the discipline involves the revocation of conduct credits. These cases hold that, because California and other states have legislatively granted inmates the right to conduct credits and created specific statutory and administrative procedural safeguard mechanisms that must be invoked before an inmate can be deprived of conduct credits, a vested liberty interest protected by the due process clause is created. Otherwise, a prisoner generally has no constitutional right to conduct credits. (*In re Rothwell, supra,* 164 Cal.App.4th at p. 165; see also *Wolff v. McDonnell* (1974) 418 U.S. 539, 557 [41 L.Ed.2d 935, 94 S.Ct. 2963]; *Hill, supra,* 472 U.S. at p. 454.)

The same is not true, however, for discipline that does not deprive an inmate of conduct credits. The United States Supreme Court in *Sandin v. Conner* points out that, although the states may under certain circumstances create a liberty interest protected by the due process clause, such an interest will generally be limited "to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, . . . nonetheless

imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (*Sandin v. Conner, supra,* 515 U.S. at p. 484, citations omitted.) We have found nothing to suggest the state Legislature or Department administration intended to grant inmates a constitutionally protected right to seek judicial review of every prison disciplinary decision. The United States Supreme Court has clearly held that all prison disciplinary decisions are *not* reviewable. (*Hill, supra,* 472 U.S. at pp. 455–456; *Sandin v. Conner, supra,* at pp. 483–484.)

■ We do not believe the issuance of a CDC 115, which arises out of an internal disciplinary system designed and implemented by the Department in order to maintain order and safety within the prison system, invokes due process guarantees. Nor do we believe a prison official's disciplinary decision is or should be subject to second-guessing by the courts. "[C]ourts are ill equipped to deal with the complex and difficult problems of prison administration and reform, which are not readily susceptible to resolution by court decree. 'Running a prison is an inordinately difficult undertaking that requires expertise, planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government. Prison administration is, moreover, a task that has been committed to the responsibility of those branches, and separation of powers concerns counsel a policy of judicial restraint.' " (*In re Collins* (2001) 86 Cal.App.4th 1176, 1182 [104 Cal.Rptr.2d 108].)

■ If we were to accept Johnson's premise that his CDC 115's are reviewable under the due process clause simply because they adversely impact the decision whether to release him on parole, *all* prison disciplinary decisions would be reviewable because *all* disciplinary decisions, no matter how minor, have the potential to adversely impact parole decisions. The parole board has been granted broad discretion in deciding whether to release an inmate back into society before he has served his maximum sentence. The parole board's discretion includes the assessment of a variety of individualized factors on a case-by-case basis, including *any* disciplinary action while incarcerated. This is because the parole board must determine whether there is a substantial risk the inmate will commit future offenses if released and whether the inmate can succeed or fail on parole. (*Morrissey v. Brewer* (1972) 408 U.S. 471, 483 [33 L.Ed.2d 484, 92 S.Ct. 2593].) Even a minor rule violation can be considered by the parole board as a factor tending to show that an inmate could not comply with the reasonable restrictions likely to be imposed by the supervising parole agent. (§ 2402, subds. (c)(1)–(6), (d)(1)–(9).)

■ The fact that Johnson is unhappy with the discipline imposed or that it might adversely impact his release on parole is not enough to invoke due process guarantees requiring judicial review of routine disciplinary decisions implemented by prison officials.[4] To do so would unjustifiably inject the courts into the complicated and risky business of retaining order in the state's prison system through prison discipline. We therefore conclude there is no authority to support Johnson's claim that the disciplinary actions are reviewable by way of habeas corpus. To the contrary, we believe there are strong policy considerations for rejecting his claim.

In any event, even if we were to conclude that Johnson had framed a due process claim subject to judicial review, we would reject his claim on the merits.

II.  *"Some evidence" rule*

A.  *April 5, 2006, CDC 115*

The April 5, 2006, CDC 115 charged Johnson with theft of state property in violation of section 3012. Although originally charged with theft of a state-issued pen and a bottle of state-issued correction fluid, Johnson was cleared of the theft of the pen when the chaplain said that he had given the pen to Johnson. Johnson, however, was found guilty of theft of the correction fluid.

■ Due process, if it were to apply in this context, requires only that there be "some evidence" to support the findings made at the disciplinary hearing. (*Hill, supra,* 472 U.S. at p. 457; *In re Estrada, supra,* 47 Cal.App.4th 1688.) Although there is no direct evidence to establish that Johnson stole the correction fluid, there is "some evidence," if believed, that he obtained the correction fluid through theft. The correction fluid was state issued and is not something routinely available to inmates in state prison.[5] Section 3006

---

[4] Johnson contends that the two disciplinary CDC 115's challenged here had a negative impact on his parole bid, therefore raising these relatively minor rule infractions to a liberty interest protected by due process. The parole board's written decision indicates that the decision to deny parole was not based on these two CDC 115's. To the contrary, the parole board's decision was based on its conclusion that Johnson poses a current risk to society because of the nature of his crime, his failure on prior probationary periods, 28 CDC 115's (including six violent attacks against other prisoners), Johnson's characterization of his institutional misconduct as nonviolent when it clearly was violent, and his lack of concern for his victims.

[5] For example, although possession of correction fluid at first blush seems to be harmless, it is flammable and is a volatile solvent commonly abused as an inhalant. (See *Strodder v. Caruso* (E.D.Mich., July 19, 2007, No. 06-10251) 2007 WL 2080416; W. Va. Poison Center information Web site <http://www.wvpoisoncenter.org/inhalant.htm> [as of Aug. 4,

provides that, "Inmates may possess only the personal property, materials, supplies, items, commodities and substances, up to the maximum amount, received or obtained from authorized sources, as permitted in these regulations." There is no evidence in the disciplinary record that Johnson offered any explanation at the hearing concerning where he obtained the correction fluid, other than to assert that it belonged to him. In addition, when first asked about the correction fluid, he told the confiscating officer that the chaplain had given him *both* the pen and the correction fluid. This was not true. Johnson's failure to answer truthfully is *some evidence* that the correction fluid was obtained by unlawful means.[6] (See *Hill, supra*, 472 U.S. at pp. 447–448 [there was "some evidence" that inmate assaulted another when guard saw inmate and two other inmates jogging away from injured inmate, even in absence of direct evidence inmate was involved in assault]; *In re Zepeda, supra*, 141 Cal.App.4th at pp. 1499–1500 ["some evidence" exists where inmate is one of two inmates sharing cell, and evidence suggested razor blades were altered to be weapons in same cell].) "Ascertaining whether this standard [the 'some evidence' standard] is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." (*Hill, supra*, 472 U.S. at pp. 455–456.) As the court stated in *Hill*, there is no requirement that the evidence presented to the prison official "logically preclude[] any conclusion but the one reached by the disciplinary [official]." (*Id.* at p. 457.)

We also conclude there is no due process violation in the hearing officer's failure to accept the chaplain's chrono, finding it was cumulative. The April 6 chrono confirmed what Johnson had claimed: that the chaplain had given the pen to Johnson, but not the correction fluid, and that the correction fluid was Johnson's personal property. The chrono also stated, "[a]t no time did Inmate JOHNSON 'steal' a state pen or bottle of Liquid White Out from [the chaplain] or the Chapel." The hearing officer personally spoke with the chaplain and confirmed what the chrono stated: that the chaplain had given Johnson the pen but not the correction fluid. The chrono does not contradict what the chaplain said to the hearing officer and does not add any significant

---

2009].) This type of substance can be problematic in a prison environment. The fact that a relatively harmless object or substance when used in general society can be converted to a dangerous or disruptive object or substance when found in a prison environment is the reason prison administration should not be second-guessed by the courts. There is a declaration attached to the return as exhibit 10 stating that correction fluid has never been available for purchase at the canteen at Kern Valley State Prison.

[6] We acknowledge that Johnson refutes this and claims he explained that the correction fluid belonged to him. The hearing officer, however, was not bound to believe Johnson and was free to accept the statement of the reporting officer as true. (*Hill, supra*, 472 U.S. at pp. 455–456 ["some evidence" test does not allow for independent assessment of witness credibility].)

information relevant to the hearing officer's consideration other than the chaplain's statement that the correction fluid was not stolen from the chapel. Prison is not a free market economy; the correction fluid must have come from someplace. Given that the hearing officer personally spoke with the chaplain, we do not see any due process violation in refusing to consider the chrono.

### B. *April 26, 2006, CDC 115*

We reach the same conclusion with respect to Johnson's second CDC 115. The rules governing possession of contraband in prison are complex and not easily evaluated outside prison walls. Johnson was charged with possessing sexually explicit material in violation of section 3006, subdivision (c)(15)(A). Section 3006, subdivision (c)(15), defines obscene material as material which, if "taken as a whole, which to the average person, applying contemporary statewide standards, appeals to the prurient interest; and is material which taken as a whole, depicts or describes sexual conduct; and which, taken as a whole, lacks serious literary, artistic, political, or scientific value." (§ 3006, subd. (c)(15)(A).) This general description is refined in section 3006, subdivision (c)(15)(C), as follows: "Material subject to the tests in paragraphs (A) or (B) includes, but is not limited to material that: [¶] (1) Depicts, displays, or describes penetration of the vagina or anus, or contact between the mouth and the genitals. [¶] (2) Depicts, displays, or describes bestiality, sadomasochism, or an excretory function including urination, defecation, or semen. [¶] (3) Portrays the nudity of a minor, or person who appears to be under 18 years old. [¶] (4) Portrays conduct which appears to be non-consensual behavior. [¶] (5) Portrays conduct which is or appears to be forceful, threatening, or violent. [¶] (6) Portrays conduct where one of the participants is a minor, or appears to be under 18 years old."

The hearing officer had before him a report that summarized the sexual nature of the article, which was found in Johnson's legal folder. The article confiscated described in detail "sex acts, sexual positions and techniques" and included pictures of "scantily clothed women." This is "some evidence" that the article from Men's Health magazine fell within the expanded definition of obscenity found in section 3006, subdivision (c)(15)(A) and (C). Although the hearing officer allegedly did not personally see the article, there is no requirement that he review it so long as there is some evidence that the article is contraband *as defined by prison rules*. Both the confiscating officer and Johnson described the article as containing sexually explicit information. Johnson claimed the article discussed female orgasm and had two pictures of a woman in lingerie.

Other paragraphs in section 3006, subdivision (c), also support the disciplinary action imposed and reach beyond to sexually explicit materials that would generally not be considered obscene outside prison walls. Section 3006, subdivision (c)(17), prohibits "[s]exually explicit images that depict frontal nudity in the form of personal photographs, drawings, magazines, or other pictorial format" and defines "sexually explicit" material as material "that shows the frontal nudity of either gender, including the exposed female breast(s) and/or the genitalia of either gender." (§ 3006, subd. (c)(17)(A).) The subdivision also provides that some sexually explicit material shall be allowed, including those items purchased or acquired by the Department as educational, medical/scientific, or artistic, for inclusion in the prison libraries or educational areas. (§ 3006, subd. (c)(17)(B)(1).) In addition, some materials not purchased by the Department can be categorized as educational, medical/scientific, or artistic if approved by the Department on a case-by-case basis. (§ 3006, subd. (c)(17)(B)(2).)

The confiscating officer defined the article found in Johnson's folder both as being obscene and as containing sexually explicit material. Although the hearing officer did not, according to Johnson, actually see the article, Johnson did not dispute the nature and content of the article. The only issue at the hearing appeared to be whether the article, given its content, could be characterized as "contraband" as defined by section 3006. Although the CDC 115 references only section 3006, subdivision (c)(15)(A), Johnson had notice that it was the sexually explicit nature of the confiscated article that the officer considered contraband. Johnson actually cites the additional regulations in his second level appeal of the discipline.

Prison officials have a strong interest in excluding material that appeals to the prurient interest of inmates. Although Men's Health magazine is not what one would normally characterize as an obscene publication, and may contain useful and socially acceptable articles properly suited for the adult eye in mainstream America, its content may not be suitable for prison inmates. The response Johnson received from the Department concerning Men's Health magazine confirms that articles appearing within this magazine are sometimes considered by the Department as falling within the definition of contraband found in section 3006. This is an area best regulated by prison officials. Courts are not authorized "to reverse prison disciplinary actions simply because, in the reviewing court's view, there is a realistic possibility the prisoner being disciplined is not guilty of the charged infraction." (*In re Zepeda, supra,* 141 Cal.App.4th at p. 1498.)

Since we conclude there is no merit to the petition, we do not address the Attorney General's claim that the petition is untimely.

## *DISPOSITION*

The petition is denied.

Hill, J., and Kane, J., concurred.

A petition for a rehearing was denied September 2, 2009, and on August 12, 2009, the opinion was modified to read as printed above. Petitioner's petition for review by the Supreme Court was denied December 2, 2009, S176324.