Filed 1/12/15  In re Salinas CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re LUIS ANGEL SALINAS<br><br>on<br><br>Habeas Corpus. | D065052<br><br>(Imperial County<br>Super. Ct. No. EHC01780) |

Petition for Writ of Habeas Corpus.  Relief granted.

Janice R. Mazur, under appointment by the Court of Appeal, for Petitioner.

Kamala D. Harris, Attorney General, Jennifer A. Neill, Assistant Attorney General, Phillip J. Lindsay and Gregory J. Marcot, Deputy Attorneys General, for Plaintiff and Respondent.

Petitioner Luis Salinas is serving a prison sentence of 25 years to life.  In 2012, Salinas was notified he was being investigated as a prison gang associate and was placed in the institution's security housing unit (SHU) pending completion of the investigation. The investigation ultimately validated Salinas as an associate of the Mexican Mafia (EME) prison gang.  Salinas remained in the SHU for approximately 10 months, during

which time he was statutorily precluded from earning postconviction custody credits because of his placement in the SHU. (Pen. Code, § 2933.6, subd. (a).)

Salinas petitioned this court for a writ of habeas corpus alleging the gang-validation procedures employed by California's prison system violated his due process rights under *Wolff v. McDonnell* (1974) 418 U.S. 539 (*Wolff*) insofar as the regulatory scheme imposed a blanket ban on his right to call and confront witnesses. He alternatively argues that, even if the decision validating him as a gang member is not reversible per se based on denial of his due process rights under *Wolff*, the decision validating him as a gang member should be reversed because the evidence did not satisfy the required showing for validating him as a gang member. We conclude the gang validation process, as applied to Salinas here, resulting in the loss of custody credits, denied Salinas the due process right to seek to call witnesses as mandated by *Wolff*.[1]

FACTUAL AND PROCEDURAL BACKGROUND

The pertinent facts are largely undisputed. In October 2012 Salinas was notified that an investigation had been completed into his alleged status as an "associate" with a

---

[1]     Our conclusions here are limited to the scheme for gang validation in effect and applied to Salinas. We note, however, that it appears California has drastically overhauled the validation process by the adoption of extensive amendments that became effective October 17, 2014. (See http://www.cdcr.ca.gov/Regulations/Adult_Operations/ docs/NCDR/2014NCR/14-02/Final_Text_of_Adopted_Regulations_STG.pdf.) Accordingly, our opinion will refer to the applicable provision of title 15 of the California Code of Regulations, as was operative and applicable to Salinas's validation, as the "former section" when the new regulatory scheme appears to have replaced the former regulatory section in effect at the time of Salinas's validation. All further statutory references are to title 15 of the California Code of Regulations unless otherwise noted.

2

prison gang,[2] the EME, and stated there was sufficient evidence to validate that determination. The October 2012 notice identified and disclosed four "source" items upon which the validation relied, including (1) a piece of paper found in Salinas's cell containing a Matlactomei symbol, which is a symbol "used by Mexican Mafia associates"; (2) a confidential memo reporting staff found a note (also known as a "kite") recovered in the administrative segregation unit identifying Salinas as "having the ability to refer other inmates in their effort to communicate with associates or members"; (3) a confidential memo stating staff found a note allegedly authored by Salinas under his gang moniker (Red) referring to another validated gang member (Goofy) and concerning the rules of conduct for gang members; and (4) a piece of paper found in Salinas's cell containing the name, California Department of Corrections and Rehabilitation (CDCR) number, and address of a validated EME associate, Raymond Tarin (also known by the moniker "Goofy"), which gave Salinas "the ability to communicate and conduct illegal gang activities on behalf of EME."

At the same time Salinas received the October 2012 notice, he was relocated into the SHU pending completion of the investigation of his gang status. Salinas met with investigators and provided oral and written responses to each of the four validation sources, stated there was more than one prisoner with the moniker "Red," and denied being involved with gangs. The investigators concluded Salinas's claims had no merit

---

2    A gang "associate" was described in the former administrative regulations as "an inmate/parolee or any person who is involved periodically or regularly with members or associates of a gang." (Former § 3378, subd. (c)(4).)

and forwarded the validation packet to the office of correctional safety (OCS) for review. Officials reviewed the validation and in March 2013 found, pursuant to the validation requirements of former section 3378, that all of the four source items met the validation requirements, and therefore validated Salinas as an associate of the EME prison gang.

Salinas pursued and exhausted his administrative remedies, and his petition for writ of habeas corpus in the superior court was denied. Shortly before his petition for writ of habeas corpus in the superior court was denied, he was removed from the SHU and placed in the general population under a two-year pilot project.

Salinas petitioned this court for a writ of habeas corpus and, after considering the Attorney General's informal response, we issued an order to show cause why the relief requested should not be granted, and appointed counsel for the petitioner. The Attorney General filed a return, and Salinas filed a traverse to the return.

THE COMPETING CLAIMS

Salinas contends the procedures for gang validation must comply with the due process protections required by *Wolff* because the consequences attending validation include the loss of the inmate's ability to earn "custody credits," and he contends the procedures applied to him did not comply with *Wolff* because an inmate was prohibited from calling witnesses when contesting the prison authority's determination.[3] The

---

3    Salinas also contends that, even assuming he was not denied his due process rights under *Wolff*, the four source items on which the validation relied in this case were insufficient under the guidelines for gang validation. The People counter that we should decline to provide for judicial review of the evidentiary basis for gang validation decisions but, if such review is warranted, we should apply the extremely deferential

4

People contend the due process protections required by *Wolff* concerning witnesses do not apply to gang validation proceedings but, even if *Wolff's* protections might apply, Salinas lacks standing to raise the instant due process challenge because he ceased losing custody credits when he was removed from the SHU and placed in the general population.

RELEVANT LAW

A. The Gang Validation Process

"Prison regulations promulgated by [CDCR] set forth the procedures and substantive requirements for validating an inmate as a member or associate of a prison gang. Because gangs 'present a serious threat to the safety and security of California prisons' [citation], validation of an inmate as a gang member or associate can result in the inmate's placement in a [SHU]." (*In re Cabrera* (2012) 55 Cal.4th 683, 685.)

*Procedural Protections*

The regulatory scheme applicable at the time Salinas was validated provided that an Institutional Gang Investigator (IGI) would investigate a suspected gang associate to determine if there is sufficient evidence (the "source items") to validate the inmate as an associate. (Former § 3378, subd. (c).) The IGI would then submit his or her findings verifying an inmate's gang identification to the OCS for validation. (*Id*. at subd. (c)(6).) Before submitting the validation package to the OCS, the IGI must interview the subject

---

"some evidence" test and conclude there was some evidence to support the validation decision in this case. Because of our conclusion that Salinas's validation decision was reached without affording him the due process rights required by *Wolff* and therefore must be vacated, it is unnecessary to reach this secondary set of arguments.

5

of the investigation, who must also be given an opportunity to be heard in regard to the source items used in the validation review, and must receive written notice at least 24 hours in advance of the interview. (*Id*. at subd. (c)(6)(A) & (B).) All source items referenced in the validation must be disclosed to the inmate at the time of notification, and he must be given copies of all nonconfidential documents and a CDC Form 1030 (Confidential Information Disclosure Form) for any confidential information used in the validation review. (*Id*. at subd. (c)(6)(C).) The IGI must document the interview and include a record of the inmate's opinion on each of the source items used in the validation, and the documented interview must be submitted with the validation package to the OCS to consider in connection with its approval or rejection of the validation. (*Id*. at subd. (c)(6)(D) & (E).)

*The Evidentiary Basis: Source Items*

"The validation of either a gang member or associate requires the recognition of three reliable source items indicative of active association with the gang, and at least one of those sources must constitute a direct link to a current or former validated gang member or associate." (*In re Fernandez* (2013) 212 Cal.App.4th 1199, 1205, fn. omitted.) The regulatory scheme applicable at the time Salinas was validated listed numerous categories of source items indicative of association with validated gang affiliates, including tattoos and symbols distinctive to the gang, written material or communications evidencing gang activity, and the inmate's association with validated gang affiliates. (Former § 3378, subd. (c)(8).) At least one of those sources must be a

6

direct link to a current or former validated gang member or associate. (*Id.* at subd. (c)(3).)

Some source items may be deemed confidential. These include information that, if known to the inmate, would endanger the safety of any person, and information that would jeopardize the security of the institution. (§ 3321, subds. (a)(1) & (2).) When confidential information was relied on to validate an associate, the inmate was given the CDC Form 1030 (Confidential Information Disclosure Form) (former § 3378, subd. (c)(6)(C)), which disclosed as much information as possible without identifying the source of that information. (§ 3321, subd. (b)(3)(B).)

*The Consequences of Gang Validation*

"[T]he validation of an inmate as a gang member or associate, like a prison disciplinary decision, can implicate the inmate's credits, thereby affecting the inmate's sentence, as well as significantly affecting his housing assignment and other conditions of confinement." (*In re Fernandez, supra,* 212 Cal.App.4th at 1215.) For example, "[e]xcept as provided at section 3335(a), section 3378(d) and subsection (c)(5), a validated prison gang member or associate is deemed to be a severe threat to the safety of others or the security of the institution and will be placed in a SHU for an indeterminate term" (former § 3341.5, subd. (c)(2)(A)(2)), which precludes the inmate from earning custody credits. (Pen. Code, § 2933.6, subd. (a).) Additionally, validation of an inmate as a gang member or associate and concomitant loss of custody credits can adversely impact the inmate's ultimate length of confinement both by delaying his initial eligibility

7

for a parole suitability hearing[4] (Pen. Code, § 3046) and by providing the parole

authority with an evidentiary basis for concluding his behavior while incarcerated renders

him unsuitable for parole. (§ 2402, subd. (c)(6) [circumstances tending to establish

unsuitability for parole include that prisoner engaged in serious misconduct while in

prison].)

*Wolff and Other Decisional Law*

"In [*Wolff*], the Court held that due process requires procedural protections before

a prison inmate can be deprived of a protected liberty interest in good time credits."

(*Superintendent, Massachusetts Correctional Institution v. Hill* (1985) 472 U.S. 445, 453

(*Hill*).) *Wolff* held that, before a state may revoke or withhold good time credits, inmates

must receive three procedural protections: (1) advance written notice of the allegations

against them, (2) an opportunity to call witnesses and present documentary evidence in

---

4    In this proceeding, the People argue in part that due process protections in the
gang validation process are inappropriate precisely because loss of custody credits
"merely affects the timing of his initial parole consideration hearing." In *Wolff*, which
established the due process protections Salinas now claims to be applicable, the court
observed that, although loss of custody credits does not visit "the same immediate
disaster that the revocation of parole is for the parolee," the loss of such credits "can
postpone the date of eligibility for parole and extend the maximum term to be served, but
it is not certain to do so, for good time may be restored. Even if not restored, it cannot be
said with certainty that the actual date of parole will be affected; and if parole occurs, the
extension of the maximum term resulting from loss of good time may affect only the
termination of parole, and it may not even do that. The deprivation of good time is
unquestionably a matter of considerable importance. The State reserves it as a sanction
for serious misconduct, and we should not unrealistically discount its significance."
(*Wolff, supra*, 418 U.S. at p. 561, italics added.) Thus, although *Wolff* acknowledged loss
of credits may merely serve to delay parole, it nevertheless concluded some level of due
process was required if the state moved to require the inmate to forfeit those credits and
thereby delay his parole.

their defense, and (3) a written statement by the factfinder of the evidence relied on and the reasons for the decision. (*Wolff, supra*, 418 U.S. at pp. 563-567.)

*Wolff* acknowledged the opportunity to call witnesses was not absolute, but could be limited to those instances "when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." (*Wolff, supra,* 418 U.S. at p. 566.) One court, discussing the ambit of *Wolff's* qualified right to call witnesses, explained that "[j]ail officials need not provide inmates an unfettered right to call witnesses, but they must make the decision whether to allow witnesses on a case-by-case basis, examining the potential hazards that may result from calling a particular person. [Citation.] '[A] blanket denial of permission for an inmate to have witnesses physically present during disciplinary hearings is impermissible, even where jail authorities provide for interviewing of witnesses outside the disciplinary procedure.' [Quoting *Mitchell v. Dupnik* (9th Cir. 1996) 75 F.3d 517, 525.]" (*Serrano v. Francis* (9th Cir 2003) 345 F.3d 1071, 1079.)

## ANALYSIS

Our review of California's gang validation process applicable at the time Salinas was validated convinces us the significant adverse consequences ordinarily attending such determination, which in fact were visited on Salinas,[5] mandate that the state comply

---

5    The People argue that because Salinas was reintegrated into the general population under a pilot program after only an approximately 10-month stay in the SHU, he is not continuing to suffer a loss of custody credits and therefore does not have any injury. However, Salinas lost some custody credits during this period and therefore has suffered an injury giving him standing to seek the present relief. Moreover, the gang validation

9

with the minimum procedural due process protections outlined on *Wolff* before it may deny an inmate custody credits based on a gang validation determination. Certainly, "[t]he due process clause does not, standing alone, confer a protected interest in preventing adverse state action during incarceration, nor does it protect against every change in the conditions of confinement having an adverse impact on the prisoner." (*In re Johnson* (2009) 176 Cal.App.4th 290, 297.) However, where disciplinary decisions *do* result in a denial of custody credits, there is a "line of cases . . . hold[ing] that, because California and other states have legislatively granted inmates the right to conduct credits and created specific statutory and administrative procedural safeguard mechanisms that must be invoked before an inmate can be deprived of conduct credits, a vested liberty interest protected by the due process clause is created." (*Ibid*.)

As this court previously recognized, "where as here, 'the State ha[s] created the right to good time [credits] and itself recogniz[es] that its deprivation is a sanction authorized for major misconduct,' a prisoner's interest in retaining good conduct credits 'has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not arbitrarily abrogated.' [Citation.] Consequently, before a prisoner can be deprived of good conduct

---

continues to hang as a Sword of Damocles over Salinas, both because it could subject him to being placed in the SHU (with the accompanying loss of custody credits) and also could provide a basis for denial of parole at his delayed parole hearing dates. (See § 2402, subd. (c)(6) [unsuitability may be premised on prisoner having engaged in serious misconduct in prison]; cf. *In re Sanchez* (2012) 209 Cal.App.4th 962 [Board of Parole Hearings citing continued involvement with prison gangs as militating against grant of parole].)

10

credits, the state must provide: '(1) advance written notice of the disciplinary charges; (2) an opportunity, when consistent with institutional safety and correctional goals, to call witnesses and present documentary evidence in his defense; and (3) a written statement by the factfinder of the evidence relied on and the reasons for the disciplinary action.' [Quoting *Hill, supra*, 472 U.S. at p. 454.]" (*In re Rothwell* (2008) 164 Cal.App.4th 160, 165 [concluding in dicta that *Wolff's* procedural protections apply in administrative proceeding that found prisoner committed rules violation resulting in forfeiture of 151 days of good conduct credits].)

The scheme in effect at the time Salinas was validated did not provide the inmate with the ability to call witnesses.[6] Although *Wolff* recognized an "inmate facing disciplinary proceedings . . . would normally be entitled to present witnesses," it did so with the recognition that "[p]rison officials must have the necessary discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority," and therefore concluded the officials "must have the necessary discretion" to deny an inmate the right to call witnesses when considerations of institutional safety or correctional goals would be impinged. (*Wolff, supra*, 418 U.S. at p. 566.) We agree with the court in *Serrano v. Francis, supra,* 345 F.3d 1071 that, although "[j]ail officials need not provide inmates an unfettered right to call witnesses, . . . they must make the decision whether to allow witnesses on a case-by-case basis,

---

6       Although the validity of the newly enacted scheme is not before us in this proceeding, it appears the new scheme provides at least the potential for an inmate to seek to obtain evidence from witnesses. (See § 3378.2, subd. (d).)

examining the potential hazards that may result from calling a particular person. [Citation.] '[A] blanket denial of permission for an inmate to have witnesses physically present during disciplinary hearings is impermissible . . . .' " (*Serrano*, at p. 1079.) Other courts have reached similar conclusions and, interpreting *Wolff*, have disapproved blanket policies categorically excluding witnesses from the hearing. (See *Ramer v. Kerby* (10th Cir. 1991) 936 F.2d 1102, 1105 ["The decision whether to grant a request to call or confront a particular witness, however, must be made on an individualized basis. A refusal to permit a staff member to testify based solely on a blanket policy excluding the testimony of a certain class of individuals does not satisfy the requirement of the individualized determination established by the Supreme Court in *Wolff.*"]; accord, *Grandison v. Cuyler* (3d Cir. 1985) 774 F.2d 598, 604; *King v. Wells* (6th Cir. 1985) 760 F.2d 89, 93; *Dalton v. Hutto* (4th Cir. 1983) 713 F.2d 75, 78.)

We recognize that the court in *In re Fernandez, supra,* 212 Cal.App.4th 1199 upheld the validation process even though the scheme did not permit an inmate to call witnesses. However, *Fernandez's* entire analysis of this issue was limited to the following statement:

> "It is true that the validation process does not encompass calling witnesses. But, as noted, the United States Supreme Court has indicated this is not required if institutional safety and correctional goals would be unduly jeopardized. Here, the context is prison gangs and institutional safety where the calling of witnesses, at a minimum, is problematic, given both the security concerns and confidential nature of the material used in the validation process. [Citing *Wolff,* at p. 566.] As also noted by the Supreme Court: 'Prison security, imperiled by the brutal reality of prison gangs, provides the backdrop of the State's interest [in the level of due process to afford]. Clandestine, organized, fueled by race-based

12

hostility, and committed to fear and violence as a means of disciplining their own members and their rivals, gangs seek nothing less than to control prison life and to extend their power outside prison walls.' [Quoting *Wilkinson v. Austin* (2005) 545 U.S. 209, 227.] [¶] Thus, we conclude that the failure to provide for witnesses is consistent with the United States Supreme Court's determination that procedural protections less demanding than those required by *Wolff* may be employed '[w]here the [proceeding at issue] draws more on the experience of prison administrators, and where the State's [due process] interest implicates the safety of other inmates and prison personnel . . . .' [Quoting *Wilkinson,* at pp. 228-229.]" (*In re Fernandez, supra,* 212 Cal.App.4th at pp. 1216-1217.)

We believe this analysis was erroneous and should not be followed. First, although briefly citing *Wolff*, the *Fernandez* court does not reconcile its approval of a *blanket* policy of prohibiting witnesses with *Wolff's* observation that an "inmate facing disciplinary proceedings . . . would *normally* be entitled to present witnesses" (*Wolff, supra*, 418 U.S. at p. 566, italics added) subject to the "necessary discretion [of prison officials] . . . to refuse to call witnesses that may create a risk of reprisal or undermine authority." (*Ibid*.) The plain language of *Wolff*, as construed by numerous subsequent federal court opinions, does not support a blanket prohibition on witnesses in gang validation proceedings. Additionally, although the *Fernandez* court, as well as the People on appeal, relied on *Wilkinson v. Austin, supra,* 545 U.S. 209 as supporting a policy of a blanket ban on witnesses, *Wilkinson* only approved Ohio's blanket limitation on witnesses when classifying prisoners for placement in a "Supermax" facility. The People on appeal argue *Wilkinson* controls here because validating a gang member and placing him into a SHU is analogous to classifying prisoners for placement into a Supermax facility. However, the *Wilkinson* court qualified the reach of its decision by

13

specifically stating that, "Ohio is not, for example, attempting to . . . revoke good time credits for specific, serious misbehavior [citing *Wolff*] where more formal, adversary-type procedures might be useful" (*id*. at p. 228), which convinces us *Wilkinson* was careful to preserve *Wolff's* due process protections when the administrative decision, as here, *does* result in "the forfeiture or withholding of good-time credits, which affects the term of confinement. . . ." (*Wolff, supra*, 418 U.S. at p. 547.) Because *Wilkinson* expressly cautioned it was *not* examining the type of administrative proceeding that could affect the term of confinement, we are unconvinced that *Wilkinson* eroded the protections required under *Wolff*, and *Fernandez* mistakenly imported *Wilkinson's* rationale when assessing the adequacy of the due process protections provided under California's decisionmaking process for gang validation.[7]

---

[7]    At least one court has observed, although in a different context, that whether *Wolff* rather than *Wilkinson* should control for gang validation procedures resulting in a transfer to a SHU "depends, in significant part, on whether the prisoner's transfer to the SHU is characterized as disciplinary or administrative" and that "[a] review of Supreme Court decisions regarding procedural process in prisons does indicate that *the loss of good time credits* is a punitive measure (related to disciplinary reasons) that *changes the due process analysis*." (*Cook v. Cate* (N.D.Cal., Aug. 14, 2014, No. 11–cv–06581–YGR (PR)) ___F.Supp.2d ___ [2014 WL 4185718], *12, italics added.) The court then noted that, "in the instant case, California is revoking good-time credits for inmates who are housed in the SHU, which the Supreme Court implies requires more adversarial procedures. *Wolff* itself is also instructive, there the Supreme Court explained: '[t]he deprivation of good time is unquestionably a matter of considerable importance. The State reserves it as a sanction for serious misconduct, and we should not unrealistically discount its significance.' [Quoting *Wolff, supra*, 418 U.S. at p. 561.] Therefore, it is possible that *California's decision to revoke good time credits has converted SHU assignment into a punitive measure (i.e., for disciplinary reasons) requiring more due process protections*." (*Id.* at p. *13, italics added.)

14

The People's remaining arguments do not undermine our conclusion that the gang validation process applied to Salinas here, which brought with it the loss of custody credits, denied Salinas the due process right to seek to call witnesses as mandated by *Wolff*. For example, the People cite *In re Jenkins* (2010) 50 Cal.4th 1167 and *In re Cabrera, supra,* 55 Cal.4th 683 for the proposition that classification decisions are vested in the prison authorities and courts should defer to their construction and application of the classification scheme. Neither case addressed whether, when an inmate is subjected to the gang validation process and loses custody credits as a result of that determination, the inmate may categorically be denied the right to call witnesses as mandated by *Wolff*. The People also cite *In re Johnson, supra*, 176 Cal.App.4th 290 to argue the due process clause does not confer a protected interest in preventing adverse state action during incarceration or protect against every change in the conditions of confinement having an adverse impact on the prisoner. Although *Johnson* held there was no right to habeas review in inmate disciplinary actions not resulting in the loss of custody credits (*id*. at pp. 296-297), *Johnson* explicitly cautioned it was not evaluating disciplinary decisions that *do* result in a denial of custody credits. (*Ibid*. [noting a "line of cases . . . hold[ing] that, because California and other states have legislatively granted inmates the right to conduct credits and created specific statutory and administrative procedural safeguard mechanisms that must be invoked before an inmate can be deprived of conduct credits, a vested liberty interest protected by the due process clause is created"].)

We are left the question of the appropriate remedy. As did the court in *In re Fernandez, supra,* 212 Cal.App.4th at pages 1214 to 1215, we believe "the appropriate

15

remedy is to attempt, as closely as possible, to return [Salinas] to the position he would enjoy if the gang validation had been unsuccessful. We shall vacate the gang validation decision and direct prison officials to expunge it from [Salinas's] prison file . . . . At the same time, our decision does not preclude prison officials from prospectively initiating a *new* validation procedure" that provides Salinas with the opportunity to call witnesses as mandated by *Wolff*. Additionally, the custody credits Salinas would have accrued during the time he was improperly placed in SHU shall be reinstated.

## DISPOSITION

The relief sought in the petition for writ of habeas corpus is granted and the CDCR is directed to vacate Salinas's gang validation decision and expunge the validation decision from his prison central file. CDCR is further directed to (1) report the expungement of Salinas's validation to all gang-related law enforcement databases and clearinghouses to which the original validation was reported previously, (2) cease housing Salinas based on the vacated gang validation decision, and (3) reinstate any custody credits forfeited by Salinas as a result of the validation decision.


McDONALD, J.

WE CONCUR:


HALLER, Acting P. J.


AARON, J.


16